UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PEOPLE OF THE STATE OF NEW YORK by
Eric T. Schneiderman, Attorney General of the
State of New York,

               Plaintiff,

            -v-                          6:15-CV-1364

UTICA CITY SCHOOL DISTRICT, UTICA
CITY SCHOOL DISTRICT BOARD OF
EDUCATION, and BRUCE KARAM,
Superintendent of Utica City School District,
in his official capacity,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                           OF COUNSEL:

HON. ERIC T. SCHNEIDERMAN          AJAY P. SAINI, ESQ.
New York Attorney General                DIANE O. LUCAS ESQ.
Attorneys for Plaintiff                    JUSTIN A. DEABLER, ESQ.
120 Broadway                             Ass't Attorneys General
New York, NY 10271

OFFICE OF DONALD R. GERACE         DONALD R. GERACE, ESQ.
Attorneys for Defendants
2615 Genesee Street
Utica, NY 13501

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

      On November 17, 2015, plaintiff Office of the Attorney General of the State of New

York ("OAG") filed this action against defendants Utica City School District (the "District"), the

District's Board of Education (the "Board"), and Bruce J. Karam in his official capacity as District Superintendent ("Superintendent Karam") (collectively "defendants").

The OAG's operative complaint alleges defendants have deliberately denied immigrant students aged 17-20 the opportunity to enroll at Thomas R. Proctor High School if they have, or are perceived to have, a limited ability to speak English. According to the complaint, District officials have instead systematically diverted these so-called Affected Immigrant Students into alternative education programs that do not, and cannot, result in the kind of high school diploma conferred on graduates of Proctor High School, the District's only high school.

The OAG brings claims pursuant to 42 U.S.C. § 1983 for violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment as well as claims under the Equal Educational Opportunities Act of 1974 ("EEOA") and Title VI of the Civil Rights Act of 1964 ("Title VI"). The complaint also enumerates pendent state law claims pursuant to New York Education Law §§ 3201-3202(1) and the New York State Constitution's Due Process Clause.

Defendants have moved to dismiss the OAG's complaint in its entirety. The motion has been fully briefed and oral argument was heard on March 30, 2016 in Utica, New York. Decision was reserved.

## II. **BACKGROUND**[1]

The New York State Constitution promises all students the opportunity to receive a free education from the State's public school system.  Compl. ¶ 19 (citing N.Y. CONST. art. XI, § 1).  The broad sweep of this simple assurance is reflected in New York's education law, which entitles any person over 5 and under 21 years of age who has not yet received a high school diploma to attend the public school located in their district for free, even if that person has already obtained a high school equivalency or general educational development diploma elsewhere.  Id. (citing N.Y. EDUC. LAW § 3202).  State education law also explicitly prohibits public school officials from refusing admission to an otherwise eligible student on account of race, creed, color, national origin, or gender.  Id. (citing N.Y. EDUC. LAW §§ 3201, 3201-A).

Of course, these basic guarantees apply with equal force to students who are, or are perceived to be, limited in the ability to speak English.  Compl. ¶ 23.  These limited English proficient ("LEP") students, often the children of immigrants, are entitled to equal access to all programs, extracurricular activities, and other services offered by the local public school, including English language instruction and grade- and age-level instruction in core curriculum subjects, such as math, science, and social studies.  Id.

In fact, New York law specifically requires that suspected LEP students be identified and assessed using certain state-approved proficiency exams to determine whether, and to what extent, they require additional language support services from the school district.  Compl. ¶ 23.  And related provisions of the State's education law even prohibit

---

[1]  The following facts are taken from the operative complaint, or from documents integral to it, and will be assumed true for purposes of resolving defendants' motion to dismiss.  See, e.g., Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 508 n. 2 (S.D.N.Y. 2010).

school officials "from inquiring about citizenship or immigration status of students or their parents or guardians, as well as requesting information which would tend to reveal immigration status, such as Social Security numbers, visa documentation, or I-94 forms" during the enrollment process.  Id. ¶ 25.

Simply put, these provisions of New York law work to ensure that immigrant students, LEP or otherwise, are entitled to an opportunity to achieve "the same educational goals and meet the same standards as the general student population."  Compl. ¶ 23.

Notably, state law *does* permit school districts to create "alternative programs" for students determined to be LEP.  Compl. ¶ 26.  But these programs must provide equal access to the educational and recreational opportunities offered to non-LEP students within the district.  Id.  Even more importantly, these alternative programs must only operate as "a bridge to general education classrooms"; that is, "they must function as a pipeline to integrated educational services provided by the school district, rather than as an educational dead-end."  Id. ¶ 28.

According to the OAG, the equal education mandates set forth above have not been achieved in Utica's school district, where twenty-five percent of the City's 60,000 residents speak a language other than English at home.  Compl. ¶ 2.  Indeed, data from the most recent Census reveals that the Utica CSD serves "one of the largest proportions of [LEP] households in New York, with one in ten households having *no* member over the age of 14 who speaks English 'very well.'"  Id.

The policy and practice at issue in this case began in 2007, when senior District personnel, including Superintendent Karam, approved the "Newcomer Program," a mandatory "English as a second language" ("ESL") program for immigrant students

aged 17-20.  Compl. ¶ 30.  That spring, District officials began systematically diverting any

immigrant student aged 17-20 who sought to enroll at Proctor High School into this

Newcomer Program, regardless of whether or not the student expressed a wish to attend

"regular" high school.  Id.

At the same time, District personnel "refrain[ed] from entering information" into the

District's student databases about immigrant students who attempted to enroll.  Compl. ¶ 31.

Among other things, this "no-records" companion practice permitted the District to avoid

conducting the English language proficiency testing on these students that would otherwise

be required by state law.[2]  Id.

The OAG alleges that this Newcomer Program was not designed as a temporary

measure to eventually acclimate Affected Immigrant Students into integrated classrooms at

Proctor High School; rather, the District implemented it as a permanent program into which

these students would be funneled.  Compl. ¶ 80.

Equally troublesome, the OAG claims that the Newcomer Program did not offer these

Affected Immigrant Students anything approaching an education on equal terms with the

non-immigrant and non-LEP students enrolled at Proctor High School—instruction in math,

science, and social studies was not even originally offered through the program, and

students received little more than basic instruction in the English language.[3]  Compl. ¶ 76.

---

[2]  The OAG's complaint briefly sets out the stories of two different immigrant families whose children
were diverted to the Newcomer Program despite their attempts to enroll at Proctor High
School.  Compl. ¶¶ 39, 42.

[3]  Later, when teachers in the program began offering "some content area instruction," high school
course credit was still not available for those lessons.  Compl. ¶ 76.

This unwritten policy of diverting LEP immigrants into the Newcomer Program without recording their attempts to enroll at Proctor High School continued in one form or another until the fall of 2014, when the Oneida-Herkimer-Madison Board of Cooperative Educational Services began offering a more comprehensive high school equivalency program named "APPLE," or "Alignment of Pathways and Programs for Learners of English."  Compl. ¶ 56.

Once the APPLE program became functional in the fall of 2014, the District essentially codified its then-unwritten policy of diversion into a "unique set of written enrollment procedures for immigrant students that were different from those applied to the general student population in the District."  Compl. ¶ 59.

For example, a document entitled "Procedures for Referring New Arrivals Who Are Under Age 21 to ESL Programming" explicitly instructs District officials to divert Affected Immigrant Students into two different channels:  first, those aged 19 or 20 are automatically referred directly to a high school equivalency program (such as APPLE); second, those aged 17 or 18 are referred to other District officials for "further consideration"—the very same officials who had been already involved in preventing the enrollment of LEP immigrant students at Proctor High School since 2007.  Compl. ¶ 60.

Both of these channels, as well as the unwritten diversionary practices that came before them, result in the educational dead-ends forbidden by law.  Compl. ¶¶ 76-81. Additional allegations in the OAG's complaint outline how the District has allegedly refused to allow these Affected Immigrant Students to attend gym, art, or music classes with non-immigrant students as well as how the District has systematically segregated these immigrant students into off-campus programs, such as APPLE.  Id. ¶¶ 64-70.  According to

the OAG, none of these policies or practices were applied to non-immigrant or English proficient students aged 17-20 who sought to enroll at Proctor High School.  Id. ¶ 61.

## III.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).[4]  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).  "In determining the existence of subject matter jurisdiction, a district court may consider evidence outside the pleadings." Saleh v. Holder, 84 F. Supp. 3d 135, 137-38 (E.D.N.Y. 2014) (citing Makarova, 201 F.3d at 113).  "Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." Id. (citations omitted).

### B.  Judgment on the Pleadings

Where, as here, a motion to dismiss for failure to state a claim has been filed after the close of pleadings, it should be construed as a motion for judgment on the pleadings pursuant to Rule 12(c).  Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).  "The standard for granting a [Rule 12(c)] motion . . . is 'identical' to that of a

---

[4] Standing and subject matter jurisdiction are actually distinct legal concepts. See, e.g., Rent Stabilization Ass'n of City of New York v. Dinkins, 5 F.3d 591, 594 n.2 (2d Cir. 1993).  However, standing is properly understood as a limitation on a federal court's authority to exercise jurisdiction over a party's claim and is thus properly considered under Rule 12(b)(1).  Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006).

12(b)(6) motion to dismiss." Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y.2012) (quoting Patel, 259 F.3d at 126).

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Ginsburg, 839 F. Supp. 2d at 540 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, dismissal is appropriate only if, construing the complaint liberally and drawing all reasonable inferences in the plaintiff's favor, the factual content does not allow for a reasonable inference that the defendant is liable for the misconduct alleged.  Id.

"On a [Rule] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" L-7 Designs, Inc. v. Old Navy, 647 F.3d 419, 422 (2d Cir. 2011) (quoting Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)).

"A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." L-7 Designs, Inc., 647 F.3d at 422 (quoting Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).  However, even where the document is clearly considered integral, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

## IV.  **DISCUSSION**

Defendants argue this action must be dismissed because:  (1) the OAG lacks standing to bring suit; (2) this action is duplicative of a prior, still-pending action; (3) the complaint fails to state plausible claims for relief; and (4) it was not brought for a "proper purpose."

## A.  OAG's Standing

Defendants argue the OAG lacks authority to bring suit against a school district because only the New York State Commissioner of Education possesses the statutory authority to enforce the "general and special laws relating to the educational system." The OAG responds that it possesses authority to bring this suit in the public interest pursuant to the doctrine of *parens patriae*.

Generally speaking, the doctrine of standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citation and internal quotation marks omitted).

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

"Because standing is challenged [here] on the basis of the pleadings, [the Court therefore] accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Carver, 621 F.3d at 225 (quoting W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008)).

As an initial matter, the statutory aspect of defendants' argument, which asserts that only the State Education Commissioner possesses the authority to bring suit, must be rejected.  Courts have regularly recognized that New York Executive Law § 63 "confers broad authority upon the OAG to prosecute legal actions in which the state has an interest" regardless of whether the head of a State department or agency has authorized the OAG to

bring suit.  E.E.O.C. v. Fed. Express Corp., 268 F. Supp. 2d 192, 196 (E.D.N.Y. 2003) (collecting cases).  As relevant here, this broad statutory grant of authority includes the power "to bring discrimination cases on behalf of the People of New York."  Id. at 195.

In a similar vein, "states have frequently been allowed to . . . enforce federal statutes that . . . do not specifically provide standing for state attorney generals" in cases where the statutes at issue included broadly phrased civil enforcement provisions.  New York ex rel. Vacco v. Mid Hudson Med. Grp., P.C., 877 F. Supp. 143, 149 (S.D.N.Y. 1995) (collecting cases).

The three federal statutes at issue in this case each contain this sort of broad civil enforcement provision.  See 20 U.S.C. § 1706 ("An individual denied an equal educational opportunity . . . may institute a civil action . . . ."); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of . . . national origin, be excluded from participation in . . . any program . . . receiving Federal financial assistance."); 42 U.S.C. § 1983 ("Every person who . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured . . . .").

Beyond these explicit grants of enforcement authority lies *parens patriae*, "the common-law principle that a sovereign, as 'parent of the country,' may step in on behalf of its citizens to prevent 'injury to those who cannot protect themselves.'"  Connecticut v. Physicians Health Servs. Of Conn., Inc., 287 F.3d 110, 119 (2d Cir. 2002) (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601 (1982)).

Consistent with this principle, "*parens patriae* standing in American courts must involve more than a state merely stepping in to represent the interests of particular

citizens." People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 811 (N.D.N.Y. 1996) (Pooler, D.J.) (citing Alfred L. Snapp & Son, Inc., 458 U.S. at 600).

Instead, a state must assert an injury to a "quasi-sovereign interest," such as the health and well-being of its citizens, that affects a "substantial segment" of its population in a manner that is "sufficiently concrete" to therefore "create an actual controversy between the State and the defendant." Peter & John's Pump House, Inc., 914 F. Supp. at 811 (citing Alfred L. Snapp & Son, Inc., 458 U.S. at 607) (footnote omitted).

The Second Circuit has since interpreted this doctrine to also "require a finding that individuals could not obtain complete relief through a private suit." Peter & John's Pump House, Inc., 914 F. Supp. at 811 (footnote and citations omitted). Importantly, however, this "additional" requirement imposes only a slight burden—it stands for the simple proposition that *parens patriae* standing is improper where the state is merely a nominal party; i.e., where the state lacks a true quasi-sovereign interest that would be vindicated separate and apart from the interests of private citizens in a lawsuit. See id. & n. 3.

Accordingly, a state may invoke the doctrine of *parens patriae* if it: (1) articulates a "quasi-sovereign interest" apart from the interests of particular private parties; (2) alleges a concrete injury to a substantial segment of its population; and (3) demonstrates that complete relief from that injury could not be obtained by individuals in a private lawsuit. Peter & John's Pump House, Inc., 914 F. Supp. at 811-12.

Here, the OAG has sufficiently alleged each of these elements. First, the complaint alleges a quasi-sovereign interest in an important aspect of the well-being of the State's residents; that is, in eradicating discrimination in educational opportunities. Compl. ¶ 12.

As the OAG points out, courts have recognized that a state's interest in protecting its citizens from a broad range of discrimination is sufficiently quasi-sovereign in nature to confer *parens patriae* standing.  See, e.g., Alfred L. Snapp & Son, Inc., 458 U.S. at 609 (noting there is "no doubt that a State could seek, in the federal courts, to protect its residents from [ ] discrimination to the extent that it violates federal law"); Peter & John's Pump House, Inc., 914 F. Supp. at 812 (noting the Second Circuit has expressly acknowledged that New York "has a quasi-sovereign interest in preventing racial discrimination [against] its citizens"); Mid Hudson Med. Grp., P.C., 877 F. Supp. at 147 (finding *parens patriae* standing where New York filed suit under the Americans with Disabilities Act and the Rehabilitation Act to protect the hearing-impaired and noting that "State attorneys general have successfully brought many such suits in *parens patriae*").

Second, the complaint alleges injury to a substantial segment of the State's population, specifically the relatively large and still growing population of LEP children of immigrant families that reside within the District.  Compl. ¶ 2.

Importantly for this element, "[t]here is no numerical talisman" that must be pleaded to establish *parens patriae* standing.  Peter & John's Pump House, Inc., 914 F. Supp. at 812; see also Support Ministries for Pers. with AIDS, Inc. v. Vill. of Waterford, N.Y., 799 F. Supp. 272, 277 (N.D.N.Y. 1992) (Smith, M.J.) (finding this element satisfied where affected segment of population was "not insubstantial" and would be "ever-increasing" absent intervention).

Third, the complaint sufficiently alleges that the prospective injunctive relief sought by the OAG would vindicate the State's quasi-sovereign interest in protecting its LEP immigrant community from discrimination in education.  For example, the OAG seeks to hire an

enrollment ombudsman as well as to impose certain pre-clearance requirements that must be met by the District when it desires to make changes to its ESL arrangements.

As other courts have noted, "private litigants might not have the tenacity or fortitude," or for that matter, the resources or incentives, to achieve complete, lasting relief for the community suffering from the ongoing discrimination alleged in this case.  Peter & John's Pump House, Inc., 914 F. Supp. at 813; see also Mid Hudson Med. Grp., P.C., 877 F. Supp. at 149 ("If [the private plaintiff] has the resources and stamina necessary for prolonged litigation . . ., he might be able to obtain relief through a private suit.  However, . . . the remote possibility that [he] could obtain relief for himself does not preclude the Attorney General from seeking 'complete relief' for all current and future" victims); Support Ministries for Pers. with AIDS, Inc., 799 F. Supp. at 278 (finding this element satisfied because "the vindication of the rights of New Yorkers to be free from discrimination . . . cannot be made dependent on the actions and potentially limited resources of private parties").

In sum, the OAG possesses statutory authority to bring this suit and has sufficiently alleged the requisite elements to establish standing pursuant to the doctrine of *parens patriae*.

### B.  Duplicativeness

Defendants next argue that this action should be dismissed as duplicative of Tuyizere, et al. v. Utica City Sch. Dist. et al., 6:15-CV-488-DNH-TWD, a civil case and putative class action opened in this District on April 27, 2015, nearly six months before the OAG filed the complaint in this case.  The OAG responds that the State's interests in this action are distinct from those of not only the named plaintiffs in the Tuyizere action, but also the interests of the

putative class members.  Alternatively, the OAG suggests consolidation of the two actions might be warranted.[5]

As part of its general power to administer its docket, "a court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions." Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000).  A suit is duplicative where the "claims, parties, and available relief do not significantly differ between the two actions." Morency v. Vill. of Lynbrook, 1 F. Supp. 3d 58, 62 (E.D.N.Y. 2014).

According to defendants, a finding of duplicativeness is warranted here because the causes of action in both lawsuits are virtually identical and the putative class in Tuyizere, which consists of "all LEP immigrants aged 17-20 who are eligible to attend public high school in Utica, N.Y. and who are, or who will be excluded from public school because of Defendants' discriminatory enrollment policy," would account for the same immigrant residents who might receive relief in this action.

For its part, the OAG responds that the prudential rule against duplicative litigation is closely related to the doctrine of claim preclusion, both of which are intended to foster judicial economy and protect the parties from vexatious litigation.  The OAG argues that under this latter doctrine, federal courts have repeatedly concluded that private citizens and the government are not in privity with each other for purposes of bringing federal claims, such as those for employment discrimination, and have consequently permitted private citizens to bring separate suits.  See, e.g., Meyer v. Macmillan Pub. Co., Inc., 526 F. Supp. 213, 217

---

[5] Federal Rule of Civil Procedure 42(a) is commonly understood to give trial judges "broad discretion" to consolidate legal actions sua sponte provided they involve "a common question of law or fact."

(S.D.N.Y. 1981) (noting that "protection of the public interest may not always dictate precisely the same approach to the conduct of litigation as protection of private interests" (citation, internal quotation marks, and explanatory parenthetical omitted)).

In other words, the OAG claims that because the plaintiffs in the two actions are fundamentally dissimilar entities for purposes of claim preclusion, they are also sufficiently dissimilar so as to preclude a finding of duplicativeness. According to the OAG, not only is the State a fundamentally different type of plaintiff than any of the private citizen plaintiffs who might receive relief in the Tuyizere action, but the State's status as the representative of the public interest will provide fundamentally different types of relief as well.

This reasoning is persuasive, especially when considered in light of the prior conclusions outlined above—that the State possesses a quasi-sovereign interest in protecting its citizens from discrimination in education that may be vindicated separate and apart from the particular interests of private parties as well as the related inability of lawsuits by private parties to obtain the "complete relief" offered by the successful litigation of this action.[6] Accordingly, this action is not duplicative of the Tuyizere action.

## C. **Failure to State a Claim**

Defendants next argue the OAG's complaint fails to state plausible claims for relief because "at no time does the complaint allege that any [LEP] immigrant was actually denied enrollment in the District." The OAG responds by highlighting a litany of specific factual allegations related to the claims at issue that, if taken as true, support its claim of an ongoing policy that worked to deny enrollment to LEP immigrants in violation of federal and state law.

---

[6] In fact, the parties to the Tuyizere action have recently signaled to the Court their desire to discontinue litigation by way of private settlement.

**1. 42 U.S.C. § 1983**

First, the OAG brings claims pursuant to § 1983, which "provides a vehicle by which parties can seek redress for violations of their federally guaranteed rights." <u>Lopez v. Bay Shore Union Free Sch. Dist.</u>, 668 F. Supp. 2d 406, 416-17 (E.D.N.Y. 2009).

A plaintiff seeking to assert a § 1983 claim against a municipal entity, such as a local government, must show that the injury was caused by a policy or custom attributable to the municipality itself. <u>See</u> <u>Los Angeles Cnty., Cal. v. Humphries</u>, 562 U.S. 29, 30-31 (2010). This policy or custom "may be pronounced or tacit and reflected in either action or inaction." <u>Cash v. Cnty. of Erie</u>, 654 F.3d 324, 333-34 (2d Cir. 2011).

In practice, this policy-or-custom requirement operates as a shield to protect municipalities from vicarious liability under § 1983—a local government can only be held responsible for its *own* illegal acts, not merely the actions of its employees. <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011); <u>see also</u> <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee.").

Therefore, a plaintiff seeking to recover against a local government "must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." <u>Cash</u>, 654 F.3d at 333 (quoting <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 37 (2d Cir. 2008)). "In short, to establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." <u>Id.</u> (quoting <u>Connick</u>, 563 U.S. at 60).

"For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under <u>Monell</u>." <u>Booker v. Bd. of Educ.</u>,

Baldwinsville Cent. Sch. Dist., 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002) (Munson, S.J.) (citation omitted).

Accordingly, "[a] school district's liability under Monell may be premised on any of three theories:  (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" Tyrrell v. Seaford Union Free Sch. Dist., 792 F. Supp. 2d 601, 630-31 (E.D.N.Y. 2011) (quoting Hurdle v. Bd. of Educ. of City of N.Y., 113 F. App'x 423, 424-25) (2d Cir. 2004) (summary order)).

In this case, the OAG alleges § 1983 claims for violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment.

### i. **Equal Protection**

"The Equal Protection Clause of the Fourteenth Amendment is 'essentially a direction that all persons similarly situated should be treated alike.'" Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000) (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  One way a plaintiff may assert a violation of the Equal Protection Clause is by alleging that:  (1) plaintiff, compared with others similarly situated, was selectively treated; and (2) the selective treatment was based on impermissible considerations.  Id.

The OAG alleges, among other things, that senior District officials enacted and directed the enforcement of an ongoing policy of deliberately diverting students aged 17-20 seeking to enroll at Proctor High School into alternative, unequal education programs based on the actual or perceived status of those students as LEP and/or immigrants.  These allegations suffice to state a § 1983 claim for a violation of the Equal Protection Clause.

### ii. __Due Process__[7]

"To state a due process violation—procedural or substantive—[p]laintiff must first show a deprivation of a constitutionally protected property or liberty interest." Berrios v. State Univ. of N.Y. at Stony Brook, 518 F. Supp. 2d 409, 418 (E.D.N.Y. 2007) (citations omitted).

As relevant here, the Second Circuit has concluded that New York Education Law § 3202(1) establishes a property right in a public education that is protected by the Fourteenth Amendment's Due Process Clause. Handberry v. Thompson, 436 F.3d 52, 71 (2d Cir. 2006); see also J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist., 898 F. Supp. 2d 516, 542 (E.D.N.Y. 2012) ("New York State's Constitution and education laws provide 'a right to a free public education for individuals under the age of twenty-one' which is protected by the Due Process Clause of the Fourteenth Amendment." (citation omitted)).

Accordingly, a viable due process claim may lie where a plaintiff alleges he "was deprived in some manner of [his] property interest in a [free and appropriate education] by [d]efendants' conduct." Tyrrell, 792 F. Supp. 2d at 630 (quoting Smith v. Guilford Bd. of Educ., 226 F. App'x 58, 63 (2d Cir. 2007) (summary order)).

The OAG's complaint does just that. In particular, the complaint alleges that LEP immigrant students under 21 years of age and who were otherwise eligible to attend Proctor High School, the public high school located within the District, were deprived of that property interest by virtue of the deliberate diversionary policies enacted and enforced by senior

---

[7] At this time, the OAG's complaint is understood to only be pressing a procedural, and not a substantive, due process claim, since "the right to public education is not fundamental." Alleyne v. N.Y.S. Educ. Dep't, 691 F. Supp. 2d 322, 336 (N.D.N.Y. 2010) (Sharpe, D.J.).

District officials.  These factual allegations suffice to state a § 1983 claim for a violation of the Due Process Clause.

## 2.  **Title VI**

"Title VI prohibits a recipient of federal funds from discriminating on the basis of . . . national origin."  Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 664 (2d Cir. 2012) (footnote omitted).  To state a claim for discrimination under this statute, a plaintiff must plausibly allege that (1) the defendant discriminated on the basis of national origin; (2) the discrimination was intentional; and (3) discrimination was a substantial or motivating factor for the defendant's actions.  Manolov v. Borough of Manhattan Cmty. Coll., 952 F. Supp. 2d 522, 531 (S.D.N.Y. 2013); see also Kajoshaj v. N.Y.C. Dep't of Educ., 543 F. App'x 11, 13 (2d Cir. 2013) (summary order).

Again, the OAG's complaint meets this standard.  Among other things, the complaint alleges that senior District officials directed their subordinates to divert LEP immigrant students aged 17-20 who sought to enroll at Proctor High School into alternative, unequal educational settings, such as the Newcomer Program and APPLE.  Compl. ¶¶ 30, 60.  The complaint further alleges these subordinates were specifically instructed to depart from normal record-keeping practices and refrain from recording the enrollment attempts of this group of students, as would otherwise be required by applicable state law.  Id. ¶ 31.  Finally, the complaint alleges that non-immigrant and non-LEP students aged 17-20 were permitted to enroll and attend Proctor High School.  Id. ¶ 34.  These allegations suffice to state a Title VI claim.

### 3. **EEOA**

The EEOA prohibits the denial of equal educational opportunities on the basis of "race, color, sex or national origin." 20 U.S.C. § 1703.[8] "This statute was 'intended to specify appropriate remedies for the orderly removal of the vestiges of the dual school system.'" Keitt v. New York City, 882 F. Supp. 2d 412, 433 (S.D.N.Y. 2011) (quoting Lopez, 668 F. Supp. 2d at 415). Accordingly, the EEOA's substantive protections "considerab[ly] overlap . . . those provided under the fourteenth amendment." United States v. City of Yonkers, 96 F.3d 600, 619 (2d Cir. 2011) (citations omitted).

As discussed in the preceding sections, the OAG's complaint is brought on behalf of LEP immigrants who have allegedly been denied equal educational opportunities on the basis of their national origin as part of a diversionary policy enacted and enforced by senior policymakers in the District. These allegations suffice to state an EEOA claim at this early juncture. Cf. Collins v. City of New York, –F. Supp. 3d–, 2016 WL 127591, at *5 (S.D.N.Y. Jan. 11, 2016) (rejecting EEOA claim where plaintiff failed to claim "that she has been denied an equal education opportunity" or "that she is bringing this cause of action on behalf of students who have been denied an equal education opportunity").

### 4. **State Law Claims**

The parties have focused their briefing and argument on the viability of the OAG's federal law claims, but it is noted that the complaint also purports to enumerate pendent state law claims pursuant to New York Education Law §§ 3201-3202(1) and the New York State Constitution's Due Process Clause. Compl. ¶¶ 106-13, 120-22.

---

[8] To be precise, the statute provides that "[n]o State" shall deny these equal educational opportunities to a member of a protected class.

These claims seem somewhat duplicative of the federal causes of action just discussed, but each survives the motion to dismiss stage for substantially the same reasons that have been articulated with respect to their federal counterparts.  Cf. <u>Kajoshaj v. City of New York</u>, 2013 WL 249408, at *5 (E.D.N.Y. Jan. 23, 2013) (treating New York Education Law claim brought on theory of improper deprivation of right to a free and public education as independently viable); <u>Filteau v. Prudenti</u>, –F. Supp. 3d–, 2016 WL 634082, at *10 n.10 (S.D.N.Y. Feb. 17, 2016) (noting plaintiff's claim under the New York State Constitution seemed duplicative of his federal due process claim but declining to address the question where neither party "distinctly briefed" the issue).

## D. <u>Proper Purpose</u>

Finally, defendants seek the sanction of dismissal pursuant to Rule 11 of the Federal Rules of Civil Procedure because the OAG filed this action for "no purpose other than to harass, cause unnecessary delay and to needlessly increase the cost of litigation."  The OAG responds that this claim is procedurally improper and consequently should not be considered.

Rule 11 requires, among other things, that "[a] motion for sanctions must be made separately from any other motion."  FED. R. CIV. P. 11(c)(2).  Where, as here, a party brings a Rule 11 motion for sanctions as part of another motion, courts routinely deny the request for sanctions as procedurally improper.  See, e.g., <u>Schenectady Indus. Corp. v. Upstate Textiles, Inc.</u>, 689 F. Supp. 2d 282, 296 (N.D.N.Y. 2010) (denying Rule 11 request for sanctions where, inter alia, it "was not filed separately from [the party's] motion for summary judgment").  Accordingly, defendants Rule 11 motion will be denied.

## IV. CONCLUSION

The OAG has statutory authority and *parens patriae* standing to pursue the claims asserted in the complaint, which sufficiently alleges that senior District officials directed the adoption and enforcement of a policy that deliberately diverted Affected Immigrant Students to educational dead-ends in violation of various federal and state laws. And given the State's unique status as the representative of the greater public good and its concomitant mandate to secure wide-ranging relief that will inure to the direct and indirect benefit of the broader community, dismissing or otherwise staying this lawsuit as duplicative of the Tuyizere action would be unwarranted.

Therefore, it is

ORDERED that

Defendants' motion to dismiss is DENIED in its entirety.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  April 18, 2016
        Utica, New York.